664 So.2d 1273 (1995)
Timothy T. PRICE
v.
EXXON CORPORATION.
No. 95 CA 0392.
Court of Appeal of Louisiana, First Circuit.
November 9, 1995.
*1276 Roy S. Bonner, II, Baton Rouge, for Plaintiff Appellee.
Richard P. Ieyoub, Attorney General, and John H. Ayres, III, Assistant Attorney General, Baton Rouge, for Defendant Appellant.
Before FOIL, J., and CRAIN[*] and TANNER,[**] JJ. Pro Tem.
FOIL, Judge.
This appeal challenges various aspects of a trial court's liability ruling, as well as its damage determination. After a thorough review of the record, we affirm.

BACKGROUND
Plaintiff, Timothy Price, filed this lawsuit against Exxon Corporation and the State of Louisiana, Department of Wildlife and Fisheries (DWF) for damages arising out of a boating incident. The record reflects that plaintiff, a commercial fisherman of 16 years, and two of his friends, were out in plaintiff's boat on February 11, 1992, searching for stolen crab cages. The boaters entered Wonder Lake, travelling approximately 30-40 miles per hour. While in Wonder Lake, the boat's motor hit a submerged pipeline and bulkhead, causing the motor to kill. As a result, plaintiff was thrown to the front of the boat. There were no warning signs or markers of any type indicating the presence of the submerged obstacle.
Alleging that he injured his back in the incident, plaintiff sued DWF on the theory that it was liable for failing to warn of the existence of the submerged bulkhead and pipeline, although DWF was aware of the presence of these obstacles and was aware that boaters had suffered damage as a result of striking these obstacles in the past. DWF urged the affirmative defenses of recreational use immunity under La.R.S. 9:2795 and contributory negligence. Prior to the conclusion of the trial, plaintiff settled with Exxon, and the matter proceeded against DWF. The trial court entered judgment in favor of plaintiff, finding Exxon and DWF negligent. The court ruled that plaintiff's boat struck a submerged pipeline and bulkhead, which caused him to suffer an aggravation of a pre-existing back condition. Exxon, the owner of the pipeline, was found negligent for failing to warn of its existence or to bury the pipeline to a safe level. As to DWF, the court ruled that it was negligent because it had notice of the existence of the bulkhead, but failed to warn thereof. The court assessed fault 60% to DWF and 40% to Exxon. Plaintiff was awarded general damages in the amount of $36,000.00, lost wages in the amount of $6,000.00 and past medical expenses in the amount of $3,000.00, along with $925.00 for property damage.
DWF filed this appeal, urging four assignments of error. DWF insists that the trial *1277 court should have found plaintiff's testimony to lack credibility, and was clearly wrong in finding that an accident occurred which caused plaintiff any injury. DWF attacks the liability ruling on numerous fronts, contending that the court erred in finding a duty on its part to warn and in refusing to accord it the protection of La.R.S. 9:2795, which limits DWF's liability to those situations where there has been a "willful" failure to warn. Lastly, DWF contends that the trial court erred in not finding plaintiff contributorily negligent.

LIABILITY

Credibility
At the outset, we address DWF's assertion that plaintiff's testimony lacked credibility, thereby casting doubt on plaintiff's entire version of the boating incident and his claim that he injured his back therein. Apparently, DWF seeks to have this court find that the plaintiff's testimony was so incredible that the trial court could not have believed that the incident did in fact occur, and that plaintiff suffered injuries as a result.
In support of this assertion, DWF relies on the fact that plaintiff's petition alleged that Barry Fanguay was driving the boat, whereas, plaintiff testified at trial that he was driving the boat. Further evidence of the alleged lack of credibility, DWF insists, is plaintiff's failure to disclose to his treating physician that he had been treated prior to the accident for lower back pain by a chiropractor.
After considering all of the evidence, the trial court ruled that the allegation in the petition that someone other than plaintiff was driving the boat was merely a human error on the part of plaintiff's original attorney. The court also found that the accident aggravated, rather than caused, plaintiff's back condition. In other words, the trial court refused to find that the discrepancy in who was driving the boat, coupled with plaintiff's failure to mention his chiropractic treatment to his physician, rendered plaintiff's entire testimony regarding the incident and his complaint of back pain beyond belief.
In matters of credibility, an appellate court gives great deference to the findings of the trier of fact. Rosell v. ESCO, 549 So.2d 840 (La.1989). The trial court is in the best position to view the demeanor and mannerisms of the witnesses. Id. After reviewing the record in its entirety, we cannot say that the trial court's decision to credit plaintiff's version of the events is manifestly erroneous, and we shall therefore defer to the trial court with respect to its finding that the alleged boating incident did indeed occur which caused plaintiff to experience back pain.

Duty to Warn
DWF argues that it had no duty to warn boaters of the existence of the submerged bulkhead because plaintiff encountered the obstacle in only one foot of water, and the danger of encountering a submerged object in such shallow depths is simply too obvious to all to necessitate a warning. It submits that there are innumerable submerged obstacles on the bottom of shallow areas such as Wonder Lake, and to hold DWF to a duty to warn about each and every obstacle in the waters under its jurisdiction would be an insurmountable burden.
As a general rule, DWF, as the surface owner of Wonder Lake, owed plaintiff a duty to discover any unreasonably dangerous condition on the premises and either correct it or warn potential victims of its existence. See Carter v. Board of Supervisors of Louisiana State University, 459 So.2d 1263, 1265 (La.App. 1 Cir.1984), writ denied, 462 So.2d 1248 (La.1985). This duty does not extend to potentially dangerous conditions which should have been observed by an individual in the exercise of reasonable care or which are as obvious to a property owner as to a visitor. Dietrich v. Allstate Insurance Company, 540 So.2d 358, 361 (La. App. 1 Cir.), writs denied, 541 So.2d 898, 902 (La.1989).
Contrary to DWF's assertion, the evidence did not establish that there was *1278 only one foot of water at the accident site. It did show that the water level at this particular site varied greatly depending on the time of year. Furthermore, as the trial court noted in rejecting the contributory negligence assertion, the area where the incident occurred in Wonder Lake appeared to be a large, continuous body of water. A DWF expert testified that the middle of Wonder Lake is deep, containing four to five feet of water. The court found as a fact that the evidence established that plaintiff reasonably perceived Wonder Lake to be an open lake area.
DWF's own expert attested that an underwater, unmarked bulkhead is a hazardous condition. DWF does not dispute this fact. In finding the State liable, the trial court made a factual finding that the danger of striking a submerged bulkhead in the shallow waters of Wonder Lake was not obvious to plaintiff, nor was this danger reasonably discoverable to him. This factual finding is governed by the manifest error standard of review. Under the dictates of Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993), this court may not reverse that factual finding unless there is no reasonable basis for the finding in the record, and the record establishes that it is clearly wrong or manifestly erroneous.
After reviewing the record, we find no basis for overturning any of the trial court's factual findings pertaining to the duty to warn issue. Accordingly, we find that the trial court did not err in ruling that DWF had a duty to warn boaters such as plaintiff of the presence of the submerged bulkhead.
Statutory Immunity
Next, DWF insists that it is entitled to the limitation of liability contained in La.R.S. 9:2795, which provides that DWF cannot be held liable for any injuries occurring on the waters owned by it, except for a "willful or malicious failure to warn" about the dangerous condition. La.R.S. 9:2795 B and E. Plaintiff, however, insists that this statutory immunity provision is an unconstitutional abrogation of sovereign immunity in contravention of La. Const. art. 12, § 10(A). In support of this claim, plaintiff relies on the recent case of Rhodes v. State of Louisiana, Department of Transportation and Development, 94-1758 (La.App. 1 Cir. 5/5/95); 656 So.2d 650, wherein this court ruled that La. R.S. 9:2800, which provides that public bodies could not be held strictly liable under La.Civ. Code art. 2317 in the absence of knowledge of the particular vice or defect which caused the damage, was an unconstitutional abrogation of sovereign immunity.
DWF contends that plaintiff did not attack the constitutionality of La.R.S. 9:2795 as it pertains to DWF's immunity in the trial court, and may not plead it for the first time in an appellate court. However, Rhodes was decided on May 5, 1995, long after this suit was filed in the trial court, and after the appeal was lodged in this court. Furthermore, this court held in 1986, in the case of Ratcliff v. Town of Mandeville, 491 So.2d 436 (La.App. 1 Cir.1986), reversed on other grounds, 502 So.2d 566 (La.1987), that recreational use immunity provisions as applied to the State do not violate the sovereign immunity proscription, as all owners of non-commercial recreational lands are treated alike. Under these circumstances, we find plaintiff's failure to plead the constitutionality of La. R.S. 9:2795 in the trial court to be excusable, and we shall address whether this court's determination in Rhodes mandates that we find that statutory recreational use immunity afforded to DWF violates the proscription against sovereign immunity.
In Ratcliff v. Town of Mandeville, 491 So.2d at 439, this court construed a prior version of La.R.S. 9:2795 which provided recreational use immunity to a "landowner," but did not specifically refer to the State of Louisiana, DWF or local subdivisions therein. This court held that a town was an "owner" entitled to invoke the protection of La.R.S. 9:2795. This court further held that allowing the State or its subdivisions to invoke the recreational use immunity did not violate the proscription against sovereign immunity because *1279 the statute was not designed to re-establish immunity on the basis of a sovereign status. Rather, by its own terms, the grant of immunity is available to any landowner who made his land available for recreational purposes. This court concluded that the State, for the purpose of the statute, stood in the same position as would any other private litigant. The Supreme Court later reversed this court's initial ruling in the Ratcliff case, finding that the town was not entitled to immunity under the statute because of the nature of the property where the injury occurred. Ratcliff v. Town of Mandeville, 502 So.2d at 567.
In 1986, by La.Acts 976, the legislature added Section E to La.R.S. 9:2795 to specifically confer immunity to DWF. DWF is granted a limitation of liability for all lands or waterbottoms it owns, leases or manages, regardless of the purpose for which the land or waterbottoms are used, and whether they are used for recreational or non-recreational purposes. La.R.S. 9:2795 grants the same immunity to all landowners who permit with or without charge any person to use their land for recreational purposes, except for owners of commercial recreational developments or facilities.
The record reflects that Wonder Lake was purchased by the State of Louisiana in 1968 and was assigned to DWF. It is indisputably a recreational area, and was purchased by the State to establish it as a recreational area. Although it is utilized by both recreational and commercial fisherman, no one is charged a fee by the State to enter Wonder Lake. Thus, for the purpose of the statutory immunity afforded under La.R.S. 9:2795, under the facts of this case, DWF stands in the same shoes as any other private owner who has made his property available for recreational use.
For this reason, the statutory immunity afforded to DWF simply cannot violate the proscription against sovereign immunity. In Rhodes, this court held that La.R.S. 9:2800 was an unconstitutional abrogation of sovereign immunity because it granted the state a privilege that was not available to similarly situated private parties, namely, a heightened burden of proof imposed on a plaintiff seeking recovery under La.Civ.Code art. 2317. It "partially resurrected sovereign immunity" because it limited liability of a governmental tortfeasor to only those situations where it had actual or constructive knowledge.
Unlike La.R.S. 9:2800, which treated governmental defendants differently from other tortfeasors, La.R.S. 9:2795 shrouds all landowners, whether public or private, who open up their lands for non-commercial recreational development with a limitation of liability. We find nothing in the Rhodes decision that would require this court to find La.R.S. 9:2795's limitation of liability, as it pertains to the DWF, constitutes a partial resurrection of sovereign immunity. Instead, we reject the constitutional attack on La.R.S. 9:2795 for the same reasons set forth in the earlier Ratcliff decision, and find no constitutional impediment to the application of the statutory immunity provision to this case.
Under the statute, in order for DWF to be liable for failing to warn of the existence of the submerged obstacle, that failure must be "willful" or "malicious." We assume there was nothing "malicious" in DWF's failure to warn of the existence of the submerged bulkhead. Instead, we must determine whether the failure to do so was "willful."
In Rushing v. State, Louisiana Health and Human Resources Administration, 381 So.2d 1250 (La.App. 1 Cir.1980), this court construed the term "deliberate and willful or malicious" for the purposes of La.R.S. 9:2791, another recreational use immunity provision, to be indicative of some type of conscious design on the part of the actor. This court noted that the term "willful" is defined in Black's Law Dictionary in numerous ways, involving "consciousness" and "intent." In Rushing, the State was found to be free from fault because, although its conduct may have been negligent, it was not "purposeful and knowing conduct from which one can conclude *1280 that the owners of the premises had a conscious design to injure." Id. at 1252. Additionally, this court stated that there was no "deliberate and willful injury" because it could not be said that the State maintained the premises with an "indifference to the natural consequences." Rushing was later cited as authority for the position that the term "willful" connotes a conscious design to injure, and is tantamount to an "intentional" act. LaCroix v. State, Department of Transportation, 477 So.2d 1246 (La.App. 3 Cir.), writ denied, 478 So.2d 1237 (1985); Johnson v. Chicago Mill & Lumber Co., 385 So.2d 878 (La.App. 2 Cir.1980).
In Bourgeois v. State Farm Mutual Automobile Insurance Company, 562 So.2d 1177 (La.App. 4 Cir.), writ denied, 567 So.2d 611 (La.1990), the court surveyed the literature and jurisprudence analyzing the terms "willful," "wanton" or "reckless." Typically, these terms are discussed together to denote a level of conduct that is somewhere between an intent to do wrong and mere negligence. See Comment, Reflections on Willful, Wanton, Reckless and Gross Negligence, 48 La. Law Rev. 1383 (1988). In Bourgeois, the court stated that actions knowingly taken, or not taken, which would likely cause injury fall into this category of cases. A conscious indifference to the consequences must be shown, and the court concluded that if an actor knows that his actions will cause harm, and proceeds anyway, there is a conscious indifference to the consequences. Id. at 1182.
Drawing on the above sources, we believe that the term "willful" as used in La.R.S. 9:2795 connotes a conscious course of action, in which an action is knowingly taken or not taken, which would likely cause injury, with a conscious indifference to the consequences thereof. In finding DWF liable, the trial court found that it was "negligent" but did not determine whether its failure to warn was "willful." Because the record is complete on the issue, we shall review the evidence de novo for the limited purpose of determining whether DWF is immune from liability under La.R.S. 9:2795.
The record reflects that the State acquired the surface rights to Wonder Lake in 1968 from Humble Oil and Refinery Company (Exxon's predecessor). Wonder Lake is located in the 55,000 acre Point Aux Chein Management Area, under the control of DWF. DWF's supervisors explained that prior to 1968, the oil companies were not required to bury their flow lines underneath the water bottom. After 1968, companies laying new lines were required to bury them, but existing lines were allowed to remain as they were. Wonder Lake was opened up by DWF for recreational and commercial fishing, and it was heavily utilized as such because of its excellent crab and shrimp producing potential.
The obstruction at issue included a flow line under the surface of the water leading to Exxon Well # 3, along with a bulkhead constructed close thereby at approximately the same height. The evidence shows that DWF had knowledge of the existence of the submerged bulkhead long before the incident in question. On January 15, 1988, an Exxon agent, Mr. James Watts, wrote a letter to Mr. William S. Peret, DWF's Assistant Secretary, advising him that fishermen in the Point Aux Chein area reported striking a submerged bulkhead with their boats. The letter provided DWF with the exact location of the submerged obstacle and noted that fishermen recommended marking the bulkhead as a hazard to navigation. The Exxon representative explained that Exxon was notifying the State of these complaints because the bulkhead was built to protect the surface of the land and was part of the surface estate. A map, depicting the area in question, was attached to the letter.
Mr. Johnnie Tarver, the Chief of DWF's Fur and Refuge Division, acknowledged that he did receive the letter from Exxon. He wrote an interoffice memorandum to DWF attorney Don Puckett, indicating that Exxon was attempting to "pass the buck" to DWF for timbers and bulkheads left on the site at the time of transfer. The attorney never responded to Mr. Tarver regarding the report.
*1281 Mr. Tarver's testimony also shows that no meaningful investigation was undertaken following Exxon's letter. He stated that he asked some agents to "check it out," and they complied. Mr. Tarver attested that the agents apparently were told someone had hit something in the area and there possibly was an obstruction in the area identified by Exxon, but it was associated with the oil platform or well in the vicinity and was Exxon's, not DWF's responsibility. He noted that no written report of the investigation was ever made, and he never responded to Exxon's letter. The Exxon agent attested that he never received a response from the State regarding the obstacle.
Given these facts, we find that the conduct of the State rises to the level of a "willful" failure to warn. The State knew that boaters were striking the submerged bulkhead at issue in this case, which caused damage to their boats and presented a hazard to navigation. The State also knew the exact location of the obstacle in Wonder Lake. Nevertheless, DWF agents made a conscious and knowing determination to do nothing about the situation. Under these circumstances, we find that DWF's conduct amounts to a conscious indifference to the danger posed to boaters who would come into contact with the submerged bulkhead. As such, we hold that DWF's failure to warn of the existence of the submerged bulkhead was "willful" and therefore, DWF is not entitled to immunity provided for in La.R.S. 9:2795.
Based on the foregoing, we find that the trial court correctly found that DWF was liable for failing to warn of the hazardous condition created by the submerged bulkhead in the shallow waters of Wonder Lake.

Contributory Negligence
Next, we address DWF's contention that the trial court committed manifest error in failing to assess any fault to the plaintiff. DWF urges that plaintiff was guilty of comparative negligence for "speeding" in an extremely shallow area.
Contributory negligence is defined as plaintiff's conduct which falls below the standard of care to which he should perform for his own protection. The standard is determined by the reasonableness of the conduct under all of the circumstances. Hano v. Louisiana Department of Transportation and Development, 519 So.2d 796, 798 (La.App. 1 Cir.1987), writ denied, 523 So.2d 861 (La.1988). Whether a particular plaintiff acted reasonably under the circumstances is a question of fact, which is reviewed by this court under the dictates of Stobart v. State, Department of Transportation and Development, 617 So.2d at 882, infra.
Mr. Adam Autin, Jr., who was familiar with Wonder Lake, observed the accident. He was aware of the existence of the submerged pipeline and when he saw plaintiff's boat pass by, he anticipated that it was going to strike the obstacle. He stated that many boaters in the area knew of the pipeline and knew exactly where to pass to avoid coming into contact with it.
Plaintiff and the two occupants of his boat all testified that they had never been in Wonder Lake prior to the incident in question. Plaintiff testified that he thought he saw crab cages as he entered Wonder Lake. The witnesses testified that there must be at least two feet of water for crab traps to function properly.
Additionally, the documentary evidence shows that the accident site is located in a seemingly open water area. Plaintiff was travelling 30-40 m.p.h. prior to striking the obstacle. DWF's own supervisor attested that he routinely drives 30-35 m.p.h. in Wonder Lake.
The trial court did not believe plaintiff was negligent in travelling 30-40 m.p.h. in what he reasonably perceived to be an open lake, especially in view of the fact that plaintiff saw crab cages in the area. After thoroughly reviewing the record, we find no manifest error in this determination.
In light of the foregoing, we conclude that the trial court properly found liability on the part of DWF. We next address the issue of damages.

*1282 DAMAGES
Lastly, DWF urges that the medical evidence established that plaintiff's back injury was entirely pre-existing, and there was no credible medical evidence to support a finding that plaintiff suffered an aggravation of a pre-existing condition.
The evidence showed that prior to the boating accident in question, plaintiff visited a chiropractor on at least 21 occasions during the years 1985 to 1990 for lower back pain. Most of these incidents involved back pain associated with lifting heavy objects. In 1990, plaintiff consulted Dr. Kinnard for a cervical problem.
Shortly after the boating incident, plaintiff saw Dr. Kinnard, complaining of back pain. X-rays were taken and an MRI was performed. Dr. Dexter Gary, who examined plaintiff one month later, found that the tests revealed a disc herniation at the L-5 level, and bulging at other levels consistent with degenerative disc disease. He believed the disc protrusion was caused by the accident. He attested that he saw plaintiff on a number of occasions, and treated him conservatively for back pain.
Dr. Gary revealed that plaintiff never apprised him that he had previously seen a chiropractor for back pain. He stated, however, that had he known of the prior lifting incidents leading to the chiropractic treatment, his focus would merely have gone from causation to aggravation regarding the later boating accident.
DWF's expert, Dr. Chris Cenac, examined plaintiff on December 12, 1993. He had all of plaintiff's previous medical history before him, including x-rays taken before and after the boating incident. He opined that plaintiff suffered from advanced degenerative disc disease and a protruding disc at the L-5 level, but attested that plaintiff's back condition pre-dated the boating incident for quite some time. He attested that the same symptoms and complaints plaintiff made regarding back pain were the same ones he had made prior to the accident. Dr. Cenac noted that given the serious condition of plaintiff's back problem, even trivial things could make his symptoms recur. Dr. Cenac opined that the accident did not cause plaintiff to suffer any new back injury, and if it did cause him any problem, it was an aggravation of the pre-existing back condition. He also admitted that plaintiff's back problems could have been elevated by the accident.
Plaintiff testified that he sought chiropractic treatment for back pain in the past, but that his pain soon subsided and he returned to work full force soon thereafter. Plaintiff and several other witnesses testified regarding plaintiff's abilities prior to and after the accident. They all stated that prior to the incident, plaintiff ran his commercial fishing business on his own, working 15-18 hours a day. Plaintiff lifted crab traps weighing over one hundred pounds on a daily basis. He also was very active, engaging in other pursuits such as hunting, scuba diving and ship building. After the accident, plaintiff had to hire individuals to help him in his crabbing operations. He and others attested that if plaintiff attempted to work alone, he would later be incapacitated for days at a time due to back pain.
A tortfeasor takes his victim as he finds him and is responsible for all natural and probable consequences of his tortious conduct. Brumfield v. Guilmino, 93-0366 (La.App. 1 Cir. 3/11/94); 633 So.2d 903, 909, writ denied, 94-0806 (La. 5/6/94); 637 So.2d 1056. When a defendant's conduct aggravates a pre-existing condition, the defendant must compensate the victim for the full extent of the aggravation. In order to award damages for the aggravation of a pre-existing condition, a causative link between the accident and the victim's current status must be established. Causation is a question of fact, which is entitled to great weight, and the determination may not be disturbed by this court in the absence of manifest error. Id.
After reviewing the entire record, we cannot say that the trial court's conclusion that the accident aggravated plaintiff's pre-existing back condition is clearly wrong, and we decline to disturb it.

*1283 CONCLUSION
Based on the foregoing, the judgment appealed from is affirmed. All costs of this appeal, in the amount of $1,722.45 are assessed to the State of Louisiana.
AFFIRMED.
NOTES
[*] Judge Hillary J. Crain, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[**] Judge Thomas W. Tanner, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.